## THE UNION BANK OF LOUISIANA v. MORGAN.

Three witnesses are necessary, to render authentic an act executed before a notary by a blind
man. C. C. 2231.

A power of attorney executed before a notary, in the presence of two witnesses, by a blind per-
son, though not an authentic act, will be admissible in evidence as an act *sous seing privé*,
on proof of the signature by one of the subscribing witnesses, corroborated by circumstances.
C. C. 1775, 2231, 2232.

A power of attorney authorised the attorney to collect debts, give acquittances, compound,
compromise, &c.; " for and in the name of the principal, to sign any bond, obligation, contract,
or agreement, or other paper whatsoever; to draw and endorse promissory notes; to draw
and accept bills of exchange"; to buy and sell all kinds of property; " and, for the principal
and in his name, to do all such other acts, matters and things, in relation to his property, es-
tate, affairs, and business of every kind or nature whatsoever, as he might or could do if
personally present and acting therein'; it being his intention to commit to said attorney the
entire management, care, and disposition of his property and affairs, as fully and absolutely
as he has now the management, care and disposition of them, and that this power should be
understood and taken in its most comprehensive sense :" *Held*, that the power was suffici-
ent to authorise the attorney to waive notice and protest of notes endorsed by the principal.

Where a note is payable at a bank, a demand made of the president of the bank, is a suffici-
ent demand.

It is no objection to a notarial protest and certificate of notice, that the notary was himself the
maker of the protested note. There is no conflict in such a case between the official duty
of the notary and his personal interests, he being primarily liable as maker whether the en-
dorser was discharged or not; and he acts against his interest in certifying his own default.

Under the stat. of 13 March, 1827, the original protest and certificate of notice of the protest
of a bill, or the duplicate original kept by the notary, are admissible in evidence, though the
protest was not transcribed in any book, nor any record book was kept by him as required
by the stat. of 14 February, 1821.

Where a note held by a bank, payable at its office, was in the hands of the cashier at the time
that demand of payment was made of him by the notary, it is no objection that it does not
appear that the notary himself had the note in his possession when he presented it for pay-
ment. *Aliter*, had the bank not been the holder, and the place of payment not at the bank.

Notice of protest addressed to the endorser of a note at a village, the post office in which was
nearest to his residence, mentioning the parish and State, is a sufficient compliance with the
stat. of 13 March, 1827, s. 2, requiring the notice to be addressed to the party, " at his domi-
cil or usual place of residence."

One who endorses a note, for the accommodation of the maker, which is afterwards discounted
in bank and the proceeds applied for the benefit of the latter, cannot protect himself from
liability in case of non-payment at maturity, on the ground of want of consideration. He
had no right to have the proceeds of the note placed to his credit.

APPEAL from the District Court of St. Tammany, *Jones*, J. The plain-
tiffs appealed in this case from a judgment in favor of the defendant, who
was sued as endorser of several promissory notes. The facts material to a cor-
rect understanding of this case, will be found in the opinion of the court, *infra*.

*Halsey*, for the appellants. 1. The Code does not exclude the blind from contracting. Art. 1775. It does not require an authentic act to give validity to their contracts. A power of attorney may be given by private act. C. C. 2961. An act which is not authentic avails as a private act, if it be signed by the parties. C. C. 2232.

2. The introduction of the protests and certificates of notice are objected to on three grounds. First, that the notary who made the protests being the maker and payer was incompetent to make a demand (because he could not pay and receive at one and the same time), nor make protest or give notice. This reason might affect the demand, but it did not render the notary incompetent to give notice, nor does it affect the demand, as the notes being payable at a particular place, no personal demand was necessary. 3 Kent, 97. 2 Peters, 543. 14 La. 327. 16 La. 276.

The second objection is, that no regular record of the protests and certificates of notice was made by the notary in a separate book, in the presence of two witnesses, as required by the act of 1821. This record was unnecessary under the act of 1827, which in this respect has repealed the act of 1821. B. and C. pp. 41, 43. The act of 1827 does not declare that protests and certificates of notice made under it must be recorded, either expressly or by implied reference to the act of 1821. Under the act of 1821, the holder of the note was obliged to furnish the original declaration of the notary; hence it necessarily passed out of the notary's hands. Under the act of 1827 a certified copy of the protest and certificate of notice is received as evidence; hence the notary retains the original. The record of the declaration under the act of 1821 was required, because the declaration itself passed into the hands of the holder of the note, to prevent falsification. But this reason for the record ceases under the provision of the act of 1827, which makes the notary guardian of the original protest and certificate of notice. *Ratione cessante, cessat et ipsa lex.*

The third objection is, that the address of the notices to the appellee, at Madisonville, parish of St. Tammany, was improper—that the words "at his domicil or usual place of residence" should have been added, is untenable.

3. The testimony proves that the notes were discounted in renewal of other notes, held by the plaintiff against the maker, and that the appellee endorsed them for this purpose.

4. It is contended that the agent had not sufficient power to bind the appellee by his waivers of protest, &c., and that the power to execute such acts must be special.

Admit that the effect of the waiver would be such, and that the power so to bind the principal must be given specially, the requisite power is given in the act.

The only question to be asked is, was the obligation by these waivers contracted in relation to the affairs entrusted to the agent. The attorney is authorised to sign any obligation, contract or agreement whatsoever in relation to his property, estate, affairs and business of every kind or nature whatsoever. This interpretation, giving the fullest effect to every expression of the act, is not only reasonable, but is required by this further clause in the act: "This power shall be understood and taken in the most comprehensive sense."

*A. Hennen*, for the defendant. The power of attorney under which the waiver of protest, &c., was made, contains the most general and extensive powers. No general power can be more full; yet, in it, nowhere is the express power given to waive protest and notice of promissory notes which the defendant had drawn and endorsed. The question then is, what is the extent of this power; and did it authorise the attorney to waive the protest and notice of the notes on which the defendant is sued as endorser? If not, judgment must be affirmed, as to those notes. It is evident that this power was not sufficient: 1st. To make a donation of slaves or real estate. "Quelque étendue que soit une procuration générale, elle ne donne pas au procureur le pouvoir de disposer par donation, d'aucune chose des biens dont on lui a donné la gestion." Pothier, Mandat, no. 164.

2d. Nor to give a gratuitous discharge of any right, nor to discharge a mortgage. "C'est une conséquence de ce principe, que le procureur *omnium bonorum* n'a pas le pouvoir de faire une remise gratuite de quelque droit qui appartiendrait au mandant; une telle remise, lorsqu'elle est gratuite, étant une véritable donation.

"C'est sur ce fondement que Gaïus décide qu'un procureur *omnium bonorum* ne peut pas, s'il n'a un pouvoir spécial, donner un consentement valable pour la

remise d'un droit d'hypothéque qui appartient au mandant: Videamus, si procurator omnium bonorum consensit, an teneat consensus; et dicendum est non posse, nisi hoc specialiter mandatum est." Pandect, lib. 20, tit. 6, l. 7, § 7. Pothier, Mandat, no. 164.

3d. Nor to make any contracts but those which, in good faith, the attorney believes to be useful to his principal; for he cannot favor the interests of third persons, nor his own. "En fin, quelque étendue que le mandant ait donné à sa procuration, le procureur n'a le pouvoir de faire d'autres contrats, que ceux par lesquels il croit, de bonne foi, faire utilement les affaires du mandant; et il n'est pas douteux qu'il excède les bornes de son pouvoir toutes les fois que, pour favoriser des tiers, et en fraude des intérêts du mandant, il dispose des biens dont l'administration lui a été confiée. Il n'est pas douteux aussi q'un procureur *omnium bonorum*, quelque étendue que soit sa procuration, en excède les bornes lorsqu'il dispose, pour son intérêt particulier, des biens dont on lui donné l'administration." Pand. lib. 17, tit. 1, l. 60, § 4. Pothier, Mandat, no. 166.

Our Code, article 2966, requires an express and special power for the following, among other purposes: To *encumber* (that is, "to load with debts." Webster's Dict. The french text says, "*engager*," i. e., "mettre en gage, donner en gage; lier par quelque obligation; accumuler les dettes." Dictionary of the French Academy); to accept or reject a succession; to acknowledge a debt; to compromise or refer a matter to arbitration; to make a transaction in matters of litigation; to make a judicial confession. Art. 2270. As none of these special powers are enumerated in this power of attorney, none of them can be exercised under it, however extensive and general the words used in it, and though it is "to be taken in the most comprehensive sense."

Our Code does not pretend to give all the cases requiring a special power: it states, however, that a general procuration or mandate "for all affairs," which vests an indefinite power to do whatsoever may appear conducive to the interest of the principal," and "conceived in general terms," "confers only a power of administration." Arts. 2963–2965.

The old Civil Code, page 422, arts. 8–11, is in general accordance with the present Code; but enumerates another case not yet mentioned: "To sue for restitution *in integrum* with regard to an act," as requiring a special power; because such an action implies a change of will. Domat, part 1, liv. 1, tit. 15, sec. 3, no. 11.

The articles of our Code are in fact taken from the Code Napoléon, arts. 1987–1989, which, we are informed by Duranton, intended to put an end to the controversies among the doctors, on the extent of a general mandate, according to the roman law. 18 Duranton, 224, art. 228. See also, Pothier, Mandat, no. 145. It appears that Duaren, one of the earliest and ablest interpreters, Doneau, the rival and equal of Cujas and Vinnius, contended for the strict interpretation of the mandate; giving to the general power, however extensive and unlimited, only the power of administration, and requiring a special authority for every other act. Pothier considered the reasoning of Vinnius as plausible; but did not dare to decide against the common opinion to the contrary, and left the decision to his readers, "lectoris erit judicium." Pothier, Mandat, no. 145. The Spanish law, of which the old Code professed to be a digest, settles the controversy completely. The doctrine of the Spanish authors was, that no procuration, however general, gave any other power than that of administration, and cut off the controversies which might arise under the Codes of Louisiana and that of France. "En todos los poderes suelen insertar los escribanos los claúsulas siguientes: 1a. Que el poderante confiere poder á su apoderado con libre, franca y general administracion: 2a. Que se lo da para que, en su virtud, haga todo lo que el haria y podria hacer por si mismo hallandose presente.......Nada aprovechan en la practica, y solo se admite el poder en lo que terminantemente contiene. Así dichas claúsulas se ponen solo por mera costumbre." 2 Tapia, 378, cap. 14, no. 14. "En la práctica solo se admite el poder en lo que suena porque las dos claúsulas se ponen por estilo, y por seguír la formula introducida." 3 Febrero Adicionado, 223–4, part 1, cap. 14, no. 19.

These authorities would settle this case fully, if it is tested by them; but it is contended that the jurisprudence of Louisiana is in opposition to them. Two cases are quoted in confirmation, *Hestres* v. *Petrovic*, 1 Rob. 119. *De Lizardi* v. *Pouverin*, 4 Rob. 393. These cases give a rule of construction different from that for which I contend. Yet, if correct, they will not help the plaintiffs. The

attorney held powers from persons who were residing out of the State; on the ground of absence and non-residence the reason of the decisions is based. But here, the principal and attorney both resided in the same parish, and both were present at the time. See also Story on Promissory Notes, § 309. These two cases are in direct opposition to two others of an earlier date. *Montillet* v. *Duncan*, 11 Mart. 334. *Louisiana State Bank* v. *Ellery*, 4 Ib. N. S. 87. In the first, it is true, the principal was present, when the notice of protest was served on his attorney; but in the last, the principal was residing out of the State, yet no reliance was placed on this absence. These cases show that here, as in France, "rien n'est plus variable que la jurisprudence de la Cour de Cassation." 3 Troplong, Privil. et Hypo. 79. This court must choose between the two sets of cases, and determine which is correct; they appear clearly irreconcilable.

But these contradictory cases turned only on the power to receive the notice of the protest of a note. Here the question presented is, could the attorney waive the protest and notice? There the attorney was passive. He received notice after protest. There is assuredly a difference between action and inaction. What is the amount of the waiver of a protest and notice of a note, which is to render the endorser liable for its payment? Is it anything short of the acknowledging of a debt? Without this waiver no debt is created; the endorser's liability is only conditional; without a protest and notice, he cannot be legally bound to pay the amount of the note which he has endorsed. It is only on the waiver, the debt is sought to be created; on that alone it can be supported. See *Marshall* v. *Overbray*, 10 La. 161. *Wallace* v. *Gwin*, 15 La. 223. The Civil Code says (article 2966): "The power must be express and special, to acknowledge a debt." Without the acknowledgment made by the attorney, in waiving the protest and notice of the note, the defendant is entitled to judgment, because by it only he became a debtor; therefore his attorney acknowledged a debt, to do which he had no power. On this principle an attorney has not the authority to waive prescription which has accrued against a debt, or to make an acknowledgment of the debt. *Durnford* v, *Clark*, 3 La. 199.

But what is it to *waive?* "To relinquish a right, claim, or privilege." Webster's Dictionary. This power was not given by the general words of the procuration, as already proved by the quotation above, from Pothier, Mandat, no. 164. The defendant had the right to require a protest of the notes, and notice. His attorney could not waive this right, without an express power. The privilege belonged to the defendant to claim an exemption from the payment of his endorsements, unless this waiver has precluded him. The whole current of decisions has been that the power must be special, to give the attorney the power to alienate, or do any act of ownership. Every such act which he may do, "must be specified in the procuration." The Code is positive, article 2965. None but the owner can relinquish or waive a claim, a right, a privilege.

No such act of ownership was authorised by the defendant, and none such could be exercised by his attorney: "Diligenter fines mandati custodiendi sunt; nam qui excessit, aliud quid facere videtur." Pandect. lib. 17, tit. 1, l. 5.

To the notes, which were protested by a notary public, there are objections equally fatal.

1st. The owner of a promissory note who hands it over to a notary to demand payment, make protest, and give notice of non-payment to the indorsers, charges him with a mandate which must be governed by the general principles of the civil law.

The notary who undertook this mandate, was the maker of the notes, of which payment was to be demanded. Any other person might have made the demand. *Harrison* v. *Bowen*, 16 La. 282. *Follain* v. *Dupré*, 11 Rob. 454. This mandate could not be performed by the maker of the note. The maker of a promissory note indorsed by the payee to a third person cannot make a presentation for payment and legal demand of himself, acting as a notary, so as to charge the endorser by notice. Such a presentation, demand and notice involves an absurdity; there can be no mandate to do an absurd or nugatoy thing.

"Il faut que ce soit une affaire qu'on puisse supposer pouvoir se faire par le mandataire. Il est évident que pour qu'un mandat soit valable, l'affaire qui en est la matière doit être une affaire qu'on puisse supposer pouvoir se faire par le mandataire; autrement le mandat est *nugatorium et derisorium mandatum*, qui ne produit aucune obligation. Par exemple, si j'ai donné commission à un

docteur agrégé, qu'un catarrhe sur la langue a privé entièrement de l'usage de la parole, de faire pour moi mes leçons aux écoles; quoiqu'il ait répondu par signes qu'il se chargeait de la commission, un tel mandat est nul, et ne produit aucune obligation, *nugatorium et derisorium est mandatum*, parceque l'affaire qui en est la matière est une affaire qui est impossible, *per rerum naturam*, que le mandataire fasse." Pothier, Mandat, no. 12.

"Il faut encore, pour la validité du mandat, que l'affaire qui en est l'objet, soit telle qu'on puisse supposer que le mandataire peut la faire. Ainsi, dans le cas où un colonel aurait donné commission à un conseiller au parlement d'aller commander son régiment, et que ce conseiller eût accepté sa commission, le mandat n'en serait point moins nul, parcequ'il s'agirait d'une chose que le mandataire ne pourrait pas faire." Merlin, Rép., verbo Mandat.

"L'achat de la propre chose du mandataire est une affaire qu'on ne peut, sans absurdité, supposer pouvoir se faire par le mandataire, étant impossible, *per rerum naturam*, que quelqu'un achète sa propre chose; *suæ rei emptio non valet.* Il est donc évident que l'achat de la chose du mandataire ne peut pas être la matière d'un contrat de mandat." Pothier, Mandat, no. 14.

"Negotium quod mandatur, tale esse debere ut in personam mandatarii cadere possit. Ex hac regula sequitur, non posse consistere mandatum emendæ rei quæ esset mandatarii propria." Pothier, Pandect. Justinian. lib. 17, tit. 1, no. 10. "Notarius non potest esse procurator in ea causa in qua officium suum præstitit." 6 Mulleri Promptuarium, 113, no. 18.

These authorities show conclusively the incapacity of the notary to perform the mandate with which he was charged; and if, in the nature of things, he could not make a demand of himself, there has been no legal protest, and the defendant is discharged of his indorsement. *Union Bank* v. *Fonteneau*, 12 Rob. 120.

2d. Supposing that this demand could be made by the maker of the note, on himself; it should appear, from the protest, that the notary had the note in his possession, and then presented it for payment. This does not appear. "The note itself must be ready for surrender, when the demand for payment is made; and in default of it, the demand will be insufficient to fix the endorser." *Eastman* v. *Potter*, 4 Vermont Rep. 313. *Warren* v. *Briscoe*, 12 La. Rep. 472.

3d. And though the note is payable at a particular place, it is evident, if the maker is present at the place when demand of payment is made, that it must be made of him personally, and not of another person. Here the maker was the notary himself, and if he could make the demand, the maker was the person nearest to him, and of him he should have made it. But the protest states positively, that demand was made of the cashier of the bank, but not of any other person. This was insufficient.

If a notary goes with a note to the domicil of the maker, and finds him there, but does not present it to him and demand payment from him, but from the holder or owner who happened to be there at the same time, will it be contended that this was regular and sufficient to fix the indorser?

4th. The protest has not been made agreeably to the statute of 1821, which requires that "the notary shall keep a separate book, in which he shall transcribe and record, by order of date, all protests, &c." The evidence shows that all the protests of this parish judge were in a loose bundle, not transcribed in a book, and without any regard to order of date. The plaintiffs cannot avail themselves of these protests, to charge the defendant.

5th. Furthermore, the notices were not given in accordance with the terms of the statute; for they were not "addressed to the endorser at his domicil, or usual place of residence." *Duncan* v. *Sparrow*, 3 Rob. 164.

6th. The defendant should have judgment on the plea of want of consideration.

The notes were discounted by the plaintiff on the endorsement of the defendant, and the proceeds thereof regularly and legally belonged to him; and could not be placed to the credit of a third person without his consent, which nowhere appears.

*Halsey*, in reply. 1. In *Fullerton* v. *Bank of United States*, 1 Peters Rep. 615, (an action against an accommodation endorser, on a note given in renewal of one which the defendant had endorsed,) the court said: "With his consent it might be applied to the satisfaction of another note for which he was endorser without his checking for the amount, and his consent may be implied from circumstances." "In strictness the note renewed is not passed to the credit of the

drawer alone, for the endorser has in effect a equal relief from the application of the proceeds."

It is contended that it should appear from the protest that the notary had the note in his possession, and presented it for payment. But it is presumed that a notary does his duty, and hence that he has the note with him when he makes the demand. *Hart* v. *Taylor*, 7 Rob. 32. *Union Bank* v. *Penn*, 7 Rob. 81. *Union Bank* v. *Lee*, 7 Rob. 75. 16 La. 311. 15 La. 375.

2. No demand of the maker was necessary.

The maker of a note, payable at a bank, must expect that demand will be made of the cashier. It was his duty to offer payment without any demand. He was in default by not offering. In 6 Mass, 525, the court said, " if the holder is at the bank on the prescribed day, ready to receive the money if the maker be there, it is enough." In *Woodbridge* v. *Brigham*, 12 Mass. 418, " the contract of the endorser was that the promiser should appear there at the day appointed for payment, and take up the note, if the proper officer of the bank should be there ready to receive the money. No demand of the promissor is necessary to charge the endorser, it being sufficient that the officers were ready to receive the money.

Here the maker went to the holder for the purpose of protesting the notes. This undertaking on his part was, virtually, a declaration to the holder that he would not pay. It will not be said, where the payer, on meeting the holder on the day and at the place of payment, tells him he will not pay, that a demand is yet necessary to put him in default. In 6 Wheaton, 171, the court said : " If the note was there, it was a presentment; and if the maker had no funds in the bank, it was a refusal of payment, according to the legal acceptation of those terms, under such circumstances." And " the presumption is that a note payable at a bank will, if it is the property of the bank, be found there at its maturity." Story on Notes, s. 243. 18 Pic. Rep. 63. 6 Mass. Rep. 524. 1 Wheaton, 171. 1 H. Black's Rep. 509. 6 Mass. Rep. 524. *Fullerton et at.* v. *Bank of United States*, 1 Peters's Rep. 604, 606. *Bank of United States* v. *Carneal*, 1 Peters's Rep. 543. The court, in *Allain* v. *Lazarus*, 14 La. 337, expressly recognized the general rule, that demand must be made at the place of payment, but considered that case an exception to the rule. In the cases in 1 Rob. 327, 1 Rob. 311, 14 La. 180, 10 La. 552, and 3 Mart. N. S. 423, where conformity to the general rule was held to be indispensable, the notes were not payable at the domicil of the holder. In *Smith* v. *Robinson*, 2 La. 405, the plaintiff failed to prove that the note was held at maturity, at its place of payment, the office of the owner's agent. The only cases where the notes were payable at the holder's domicil, are *Allain* v. *Lazarus*, 14 La. 331, and *Murin* v. *Perot*, 16 La. 276, and in these, as we have seen, the court considered the formal presentment and demand unnecessary. In *Fullerton et al.* v. *Bank of United States*, 1 Peters, 604, 606, the court said : " Modern decisions go to establish, that if the note be at the place on the day it is payable, this throws the onus of proof of payment upon the defendant. This is more reasonable than to require of the plaintiff the proof of a negative, and comports better with the general law of contracts." In *Bank of United States* v. *Carneal*, 2 Peters, 543 : " If the bank has funds of the maker in its hands, that might furnish a defence to a suit brought for non-payment. But this is properly matter of defence to be shown by the party sued, like any other payment, and not matter to be disproved by the bank by negative evidence.

3. As to the sufficiency of the power of attorney, to authorise the agent to receive notices of protest :

In *Louisiana State Bank* v. *Ellery*, 4 Mart. N. S. 87, the act of mandate aurised the agent " to transact the following concerns in and with the Louisiana State Bank," among others to endorse notes. Under this power, the agent had endorsed the note sued on. It was argued, that the power to endorse includes that of receiving notice. The court said, " the power is a special one, and cannot be extended beyond what is expressed in it." " The power to receive notice, is not necessarily included in that of endorsing."

In *Montillet* v. *Duncan*, 5 Mart. 394, the plaintiff relied on an act of mandate and the testimony of his agent and others. The act appointed the agent " to transact the following concerns in and with all the banks in New Orleans," specifying them ; and concludes, " binding myself to all the acts of my said attorney touching the premises." The court said : " The power produced does not con-

UNION BANK v. MORGAN.

fer on the attorney in fact, authority to receive notices," In this case the mandate was special, it did not express a power to receive notice of protest, and, being special, it could not be extended beyond what was expressed in it.

In the case of *DeLizardi* v. *Pouverin*, 4 Rob. 393, and *Hestres* v. *Petrovic*, 1 Rob. 119, the acts of mandate contained, besides a certain special power, a power of administration. The power to receive notice of protest was not expressed. The court said, in *DeLizardi* v. *Pouverin*, "notice to an attorney in fact is, in our opinion, sufficient, although the procuration does not specially confer upon him the power to receive notices of protest, if it gives general powers to transact the business of the principal, he being abroad." Judge Story gives the same rule: "Notice to a known general agent will be equivalent to notice to his principal." Story on Notes, ss. 307, 309. These authorities settle the rule, that the power to receive notice of protest can be given by a general mandate.

4. But the defendant argues that he is not within the reason of these decisions. That they are based on the ground of absence of the principal. Absence is not the only circumstance which can enlarge the administration of a general agent. The defendant was blind. His blindness rendered the employment of an agent necessary. And his employment of an agent under this necessity, implied his intention to entrust the management of his business entirely to the agent. Pothier says: "Quand même une procuration générale ne contiendrait aucune clause particulière, je crois qu'elle peut, par les circonstances, recevoir plus au moins d'étendue. Par exemple, lorsque celui qui a donné à quelqu'un une procuration générale pour gérer ses affaires, demeure sur le lieu ou dans un lieu peu éloigné de celui ou se fait la gestion de ses affaires, je pense qu'il est ordinairement présumé en ce cas n'avoir voulu comprendre dans sa procuration générale de ses affaires courantes et ordinaires; et que si, depuis sa procuration, il survénait quelque affaire extraordinaire, qui n'eut pas été prévue lors de la procuration, cette affaire ne devait pas y être facilement presumée comprise. Le procureur omnium bonorum étant en ce cas à portée d'en instruire le mandant avant que de l'entreprendre, ne doit pas l'entreprendre sans l'avoir informé, et sans avoir récu de lui pour cela un pouvoir spécial." Mandat, sec. 147. What the general power of attorney cannot include, when the principal is at hand, must be something extraordinary. The defendant knew that the maker of these notes was insolvent, and must have expected that at their maturity he would either be called on to renew his endorsements, or see the notes protested. Hence, under the rule given by Pothier, this mandate included the management of whatever the defendant's interest might require at the maturity of these notes.

The judgment of the court was pronounced by

SLIDELL, J. This suit is brought on several promissory notes, drawn by *Briggs* and endorsed by the defendant. All these notes stipulated interest from maturity, at the rate of seven per cent per annum. They were all payable at the office of the bank at Covington. All these notes are proved to have been discounted by the bank for the benefit of the maker, the endorser having endorsed for his accommodation. It is also proved that *Briggs* was insolvent at the maturity of the notes. The endorser was blind at the time of endorsing these notes and of the execution of certain other instruments, which will be noticed hereafter; but the genuineness of all his signatures is incontestibly proved, and there is no evidence in the record to show that any fraud has been practiced upon him in obtaining the signatures. *Morgan* had been for many years, and before he became blind, an accommodation endorser for *Briggs*, and the notes sued upon were renewals of previous notes, upon which *Morgan* was endorser. Various points have been presented by the counsel for the defendant, which we proceed to notice.

Upon three of the notes, on the respective days of their maturity, there was endorsed an agreement, by which the endorser declared that he waived the formality of protest, and held himself bound as though the note had been legally protested and he duly notified. One of these agreements further

states expressly, that he waives the formality of notice. The legal effect of all these agreements is the same, and if binding at all, place the endorser in the same position as if formal protest had been duly made, and due notice given. These agreements, however, were not signed by *Morgan*, but by his son *John Joseph Morgan*, as attorney of the defendant; and two questions are here presented is the execution of the power of attorney proved, and, if so, did the instrument creating the agency authorise the attorney to sign such agreements?

The power of attorney was executed before a notary public and two witnesses, and on its face purports to be an authentic act. But its admissibility, as an authentic act, was destroyed by the plaintiffs' acknowledgment that, at the date of the act, *Morgan* was blind. The court properly refused to admit it in evidence as an authentic act, under article 2231, which declares that "the authentic act, as relates to contracts, is that which has been executed before a notary public, or other officer authorised to execute such functions, in presence of two witnesses, free, male, and aged a least fourteen years, or of three witnesses, *if the party be blind.*" Upon this refusal of the court, the original act was produced, the signature of *Morgan* was proved by one of the subscribing witnesses, and it was then received in evidence, the defendant excepting, "that if it could not be received as an authentic act, for the want of a sufficient number of witnesses, *a fortiori* it could not be received as a private act." The court did not err. The blind are not declared by our law incapable of contracting. "All persons have the capacity of contracting, except those whose incapacity is specially declared by law. These are persons of insane mind, slaves, those who are interdicted, minors, married women." Civil Code, art. 1775. Article 2231 is expressly affirmative of the capacity of the blind to contract. The requisition of three witnesses touches only the authenticity of the instrument—its competency as proof *per se*. The article of the Code immediately following declares: "That an act which is not authentic through the incompetence or the incapacity of the officer, or through *a defect of form*, avails as a private writing, if it be signed by the parties." Here the act was signed by the party; his signature is incontestibly established by the subscribing witness; and there is no proof, and not even a suggestion, of fraud or mistake. It must also be observed that the execution of the power cannot be considered as resting upon the testimony of a single witness. Various circumstances established by the evidence in this cause corroborate the proof of execution; and not the least of these is the action of his own son, as the father's attorney. To disbelieve the execution of the instrument would involve, as a necessary consequence, that the son had attempted the commission of a fraud upon his father. We can hardly suppose that counsel, had they viewed the matter in this light, would have presented an argument which, if sustained, would save the parent by the dishonor of his child.

Considering the execution of the power of attorney as duly established, what is its legal effect? Did it authorise the son to sign the agreement of waiver above stated? The power is very full and comprehensive. After conferring the usual authority to collect debts, to give acquittances, to compound, compromise, &c., it contains these words: "Also for him and in his name to sign any bond, obligation, contract, or agreement, or other paper whatsoever; to draw and endorse promissory notes, to draw and accept bills of exchange." Then follows an authorisation to buy and sell all kinds of property, "and also, for him and in his name, to do all such other acts, matters and things, in relation to his property,

UNION BANK v. MORGAN.

estate, affairs, and business of every kind or nature whatsoever, as he might or could do, if personally present and acting therein; it being his intention to commit to the said *John Joseph Morgan* the entire management, care and disposition of his property and affairs, as fully and absolutely as he has now the management, care, and disposition of them, and *that this power should be understood and taken in its most comprehensive sense*." We are of opinion that this power fully authorised the agreements in question. The authority to sign any bond, obligation, or agreement whatsoever, standing side by side with the authority to make even a new note, and fortified by the broad declaration that the whole power should be understood in its most comprehensive sense, comprehends, if language has any force, the agreement of waiver made with regard to notes already executed by the party himself; and any other interpretation would make such powers of attorney, instruments of deception. It cannot be said that, in the present case, there was even an indiscreet exercise of the power of the agent. *Briggs* was insolvent, and the waiver of the formality of protest and notice was a saving of expense to the principal.

A portion of the notes sued upon were protested, and notices were given by *Lyman Briggs*, parish judge and *ex officio* notary for the parish of St. Tammany; and the protest and certificates of notice, signed by *Briggs*, in his official capacity, being offered in evidence, they were objected to, as appears by the bill of exceptions, on the ground that *Briggs* was incapable of so doing, because he was the maker of the notes and could not pay and receive at one and the same time, and was also incapable of giving notice. So far as the question of presentment is concerned, the bill of exceptions and the argument of the learned counsel upon it, are based uopn the erroneous assumption that a presentment to *Briggs* personally was necessary; and, these premises being assumed, it is contended that *Briggs* could not make a demand of himself, and that the mandate to do so was a vain and void mandate. When a note is made payable at a bank, it is a good demand if made upon the cashier of the bank, as was done in this instance.

In support of the general position of the incapacity of a public notary to certify his own personal default, the learned counsel has exhibited no textual provision of law, and the analogy in a case in which the Code has expressly treated of the subject is against him. Even in the graver duties of the judiciary, a judge is not incapacitated by his personal connection with the cause. If he be interested in the cause, he may be recused, or may recuse himself; but the law does not absolutely incapacitate him. The public officer and the individual are not identical. There was, in this case, no conflict of the official duty of the notary with his private interest; for whether the endorser was discharged, or held on the note, was immaterial to him as maker and primarily liable. As to *Briggs* himself, he was acting against his own interest in recording his own default.

Another ground of exception to the admissibility of the protest and certificates of notice was, "that there was no regular record of the protests and notices, made in a separate book, and recorded in the presence of two witnesses by said notary, as is required by the statute of 1821." It appears by the bill of exceptions, "that the parish judge was called upon to produce the book of protests, and thereupon brought into court a large bundle, amongst which were three sheets containing exact duplicates of the three offered in evidence; these were loose sheets, not arranged in the order of their dates, but some that purported to be protests of the year 1842, were placed in the bundle after others that were

<div align="right"></div>

dated in the year 1844; the whole tied in bundles, and placed between two pasteboards, which had the appearance of the binding of a book."

The act of 1827 does not require the keeping of a separate book for transcription and record; and under it the original protest and certificate of notice given to the bank, or the duplicate original kept by the notary, was competent evidence.

It is objected that it does not appear from the protest of the notary, that he had the note in his possession when he demanded payment. It is manifest, not only from the evidence of the cashier but from the protest, that the notes were held by the bank at maturity. The notary declares in each protest that he went to the bank on the day of maturity, at the cashier's request; and he declares that the cashier was the holder of the note, of which the copy annexed to the protest is a true copy. These declarations show that the note was in the hands of the cashier at the time, and that the notary must have taken a copy of it, and we are at a loss to see the difference between the cashier's showing the note to the notary and asking him to protest it, and putting the note formally into the manual possession of the notary before he made the demand. If the bank had not been the holder, and the place of payment had not been at the bank itself, the objection would have been material.

The notices were mailed at Covington, in the parish of St. Tammany, addressed to the endorser, at Madisonville, parish of St. Tammany, La. *Morgan* lived about two miles from Madisonville. It was the post office nearest to his residence, and the notice was properly thus mailed and addressed.

*Morgan* had no right to have the proceeds of the notes when discounted passed to his credit, it being shown that he was the accommodation endorser for *Briggs*, to take up whose protested paper, endorsed by *Morgan*, the notes were discounted.

It is therefore decreed that the judgment of the court below be reversed; and it is decreed that the plaintiffs recover of the defendant *David B. Morgan*, the sums following, and interest thereon, at the rate of seven per centum per annum, from the respective dates hereinafter mentioned, until paid, to wit: the sum of $600, with interest at said rate thereon from the 21st day of June, 1842; the further sum of $220, with interest at said rate thereon, from the 27th day of June, 1842; the further sum of $1,450, with interest at said rate thereon, from the 30th day of July, 1842; the further sum of $450, with interest at said rate thereon, from the 15th day of August, 1842; the further sum of $140, with interest at said rate thereon, from the 22d day of August, 1842; the further sum of $380, with interest at said rate thereon, from the 19th day of October, 1842; and the further sum of $460, with interest thereon at said rate, from the 29th day of October, 1842; and costs in both courts.*

---

* Eustis, C. J., did not sit in this case, being interested.